## State of Connecticut *v.* John H. Gagnon
## (6435)

Dupont, C. J., Norcott and Foti, Js.

Argued January 11—decision released June 27, 1989

*Richard Emanuel,* for the appellant (defendant).

*Paul J. Ferencek,* deputy assistant state's attorney, with whom were *Walter D. Flanagan,* state's attorney, and, on the brief, *Mary Elizabeth Baran,* assistant state's attorney, for the appellee (state).

FOTI, J. The defendant appeals from the judgment of conviction,[1] after a jury trial, of criminal impersonation in violation of General Statutes § 53a-130[2] and sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1) (A). The defendant claims that the trial court erred (1) in denying his motion for judgment of acquittal on the charge of sexual assault in the third degree, (2) in denying his motion to suppress evidence of two out-of-court identifications, (3) in denying his motion to suppress certain evidence seized from the defendant's home pursuant to a search war-

---

[1] The defendant also was charged with one count of coercion in violation of General Statutes § 53a-192 (4). Prior to jury deliberations, the court granted the defendant's motion for judgment of acquittal on that count.

[2] "[General Statutes] Sec. 53a-130. CRIMINAL IMPERSONATION: CLASS B MISDEMEANOR. (a) A person is guilty of criminal impersonation when he: (1) Impersonates another and does an act in such assumed character with intent to obtain a benefit or to injure or defraud another; or (2) pretends to be a representative of some person or organization and does an act in such pretended capacity with intent to obtain a benefit or to injure or defraud another; or (3) pretends to be a public servant, or wears or displays without authority any uniform or badge by which such public servant is lawfully distinguished, with intent to induce another to submit to such pretended official authority or otherwise to act in reliance upon that pretense."

rant, (4) in admitting certain items into evidence, (5) in admitting certain police identification testimony, and (6) in refusing to poll the jury concerning media coverage of the trial. We find no error.

The jury could reasonably have found the following facts. On the afternoon of March 2, 1987, at approximately 4:15 p.m., the complainant was operating her car in Brookfield. The car had a temporary license plate, which had expired two months earlier, affixed to the rear window. While proceeding on Federal Road, she looked in her rear view mirror and observed a car with a flashing red light behind her. Believing it to be an unmarked police car, she drove to the side of the road and remained in her car. Looking through the rear and side view mirrors, she observed a dark blue car with an antenna on the right side, a red flashing light on the left side of the roof, and a "star-like" emblem or ornament on the front of the hood above the grill. She also observed the male operator of the car exit the vehicle and walk up to the driver's side window of her vehicle. The complainant had a clear view of him as he approached her vehicle. According to the complainant's description, the man was tall, walked with a limp, was of average build, and had a mustache, dirty blond hair and a red mark over his right eye. He wore dark blue pants, black shoes, a belt with a silver buckle, and had a shiny silver badge affixed to his left shirt pocket. When the defendant reached the car, he introduced himself as Officer Taylor and informed the complainant that she was driving a car with an unregistered license plate, but that he would "forget about the whole thing" if she went to bed with him. He then reached into the complainant's car and grabbed her breasts tightly with both hands so that she was pinned to the seat. The victim put her car into gear and sped off, leaving the man standing there mouthing words that she could not hear. The entire incident lasted approximately thirty seconds.

As a result of the assault, the victim sustained "finger bruises" or "fingerprints" on her breasts that lasted for three weeks to a month and caused her pain and discomfort.

That evening, at approximately 7:30 p.m., the victim reported the incident to the Brookfield police. She gave the police an oral description of her assailant which was transcribed into a two page statement. The police also prepared a sketch of the badge worn by her assailant. The following day the victim returned to the Brookfield police department, and a composite sketch of her attacker was drawn from her description.

The victim made three out-of-court identifications and one in-court identification of the defendant. Other facts relevant to the issues in this appeal will be discussed below.

I

The defendant's first claim is that the trial court erred in denying his motion for judgment of acquittal. The defendant argues that the state failed to establish beyond a reasonable doubt the elements of sexual assault in the third degree as required by General Statutes § 53a-72a (a) (1) (A). In particular, the defendant relies on *State* v. *Hufford,* 205 Conn. 386, 533 A.2d 866 (1987), and claims that the state failed to prove that he used "force" to compel the sexual contact. The state maintains that this case is distinguishable from *Hufford.* We agree with the state.

Although *State* v. *Hufford,* supra, presents a similar factual scenario, the pertinent facts of this case are distinct. In *Hufford,* the victim was sexually assaulted by an ambulance technician while en route to the hospital. After the defendant and another technician had restrained her on a stretcher so that she was unable to move her limbs, she was placed in the rear of the

ambulance alone with the defendant. The defendant unbuttoned her blouse and unzipped her pants and sexually assaulted her. The defendant was charged and convicted of sexual assault in the third degree pursuant to General Statutes § 53a-72a (a) (1) (A).[3] The Supreme Court reversed the defendant's conviction finding that the defendant did not exert the "force" necessary to compel the sexual assault as required by General Statutes § 53a-72a (a) (1) (A). *State* v. *Hufford,* supra. The court explained that to prove the "use of force" element the evidence must demonstrate either "violence or some other form of physical coercion." Id., 392.

In reaching this result, the court in *Hufford* compared sexual assault in the third degree; General Statutes § 53a-72a (a) (1) (A); with sexual assault in the fourth degree; General Statutes § 53a-73a (a) (1) (E); and examined the legislative background of these statutes. The court explained that "[w]hile both statutes proscribe nonconsensual sexual contact, sexual assault in the third degree by use of force contemplates a will overborne by physical coercion, whereas sexual assault in the fourth degree addresses subjection to sexual contact upon a physically helpless person without the victim's consent under circumstances not necessarily requiring physical force." Id., 393.

In order to effectuate the sexual assault in *Hufford,* "[n]either violence, nor physical coercion, nor use of superior strength was necessary" because "[t]he complainant had been *legally* rendered immobile for transport to the hospital . . . ." (Emphasis added.) *State*

---

[3] General Statutes § 53a-72a (a) (1) (A) provides: "A person is guilty of sexual assault in the third degree when such person (1) *compels* another person to submit to sexual contact (A) *by use of force* against such person . . . ." (Emphasis added.)

"General Statutes § 53a-65 (7) (B) defines 'use of force' as 'use of actual physical force or violence of superior physical strength against the victim.' " *State* v. *Hufford,* 205 Conn. 386, 391, 533 A.2d 866 (1987).

v. *Hufford,* supra, 393. The present case is distinguishable in that the victim in this case was *illegally* rendered immobile as a result of the defendant's actions. The defendant, by impersonating a police officer, was able to force the victim to pull her car off the road, thereby rendering her physically helpless. See *State* v. *Rodgers,* 198 Conn. 53, 61, 502 A.2d 360 (1985). We conclude that the defendant's conduct constituted physical coercion. By using a subterfuge of being a police officer, the defendant caused the victim to stop her vehicle. Such coercion was intended to and did in fact place the victim in a position wherein she was compelled to submit to sexual contact by the defendant.[4]

We hold, therefore, that on the facts of this case the jury could reasonably have concluded that the defendant used force to compel the complainant to submit to sexual contact, as contemplated by General Statutes § 53a-72a (a) (1) (A). Accordingly, there was no error in the trial court's denial of the defendant's motion for judgment of acquittal on that charge.

## II

The defendant's next claim is that his federal and state constitutional rights[5] to due process of law were violated by the trial court's denial of his motion to sup-

---

[4] The state asks us to distinguish *State* v. *Hufford,* 205 Conn. 386, 391, 533 A.2d 866 (1987), on the ground that unlike the "mere touching" in *Hufford,* the sexual contact in this case was forceful in that by grabbing the victim's breasts the defendant exercised excessive force and thereby hurt her. We decline to distinguish *Hufford* on that basis because we conclude that the degree of force used in the sexual contact is not the controlling factor for the crime of sexual assault in the third degree but rather the force used to *compel* the sexual contact. Id.

[5] Both the fourteenth amendment to the United States constitution and article first, § 8, of the Connecticut constitution guarantee the right of a defendant not to be deprived of his liberty without due process of law.

The defendant concedes that he did not raise his state constitutional claim at trial in that his motion to suppress only cited the federal constitution. Despite his failure to raise his state claim distinctly at trial, the defendant

press two out-of-court identifications, and its subsequent admission of both the in-court and out-of-court identifications. The defendant argues that the pretrial identification procedures utilized by the police were impermissibly and unnecessarily suggestive, and that those procedures rendered all subsequent identifications inherently unreliable. We disagree.

The following facts are relevant to the defendant's claim. Two days after the assault, Lieutenant Arthur Sullo of the Danbury police department examined the composite picture that was drawn from the victim's description of her assailant, and notified the Brookfield police that he suspected the defendant was the perpetrator. Sullo was acquainted with the defendant because the defendant is a local practicing psychotherapist and had volunteered his services for the Danbury police department's Hostage Negotiation Unit and also had been hired as a consultant.

On March 10, 1987, two detectives from the Brookfield police department contacted the complainant and requested to meet with her. At about 11 a.m., the detectives picked up the victim at her home and proceeded to the Brookfield police department. En route to the police station, after being asked to observe cars for the purpose of identifying those that resembled the one driven by her assailant, the victim pointed to the defendant's car which was parked in the driveway of his residence. The detectives then drove the victim to a restaurant in Danbury where she was asked to observe the people entering and exiting the building.

urges us to consider it under *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973).

It is unnecessary for us to decide whether the defendant's state constitutional claim is reviewable under *Evans* because the defendant has not provided us with any separate analysis of that issue. We, therefore, decline to undertake such an analysis and review this claim with reference only to the federal constitution. See *State* v. *Nelson,* 17 Conn. App. 556, 568–69, n.9, 555 A.2d 426 (1989).

She was seated in the front seat of an unmarked police car which was parked about twenty-five feet from the entrance to the restaurant. She observed approximately twenty to thirty white males entering and exiting that restaurant.

After a short time, the defendant arrived at the restaurant as a passenger in a grey, four door Dodge Diplomat that parked in front of the vehicle in which the complainant was seated. The car was driven by Sullo, who had arranged to have lunch with the defendant that day for the specific purpose of the viewing. As the defendant exited the vehicle and walked toward the restaurant, the complainant positively identified him as her attacker.

After Sullo and the defendant entered the restaurant, the officers and the complainant went to the police station. At approximately 1:15 p.m., they returned to the restaurant and parked in front of the vehicle that the defendant had exited. Upon seeing the defendant leave the restaurant and walk to the car, the victim made a second positive identification of him. Later that day, at the police station, the victim gave a handwritten statement in which she indicated, inter alia, that the defendant's hair appeared darker in color and his mustache was now a little longer.[6]

"The due process clause of the fourteenth amendment to the United States constitution requires the exclusion of identification evidence when the procedure used was so impermissibly suggestive as to give rise to a very substantial likelihood of an irreparable misidentification. *Simmons* v. *United States,* 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968); *State* v. *Doolittle,* 189 Conn. 183, 190, 455 A.2d 843 (1983). 'In

---

[6] A third out-of-court identification occurred on June 24, 1987, when the victim was at the Danbury courthouse. While in the hallway, the victim recognized the defendant as he stepped out of an elevator.

order to establish that a pretrial identification procedure has violated a defendant's constitutional right to due process, the defendant must prove (1) that the identification procedure was unnecessarily suggestive, and (2) that the resulting identification was not reliable under the totality of the circumstances.' *State* v. *Hunt,* 10 Conn. App. 404, 407, 523 A.2d 514 (1987). Whether such an identification procedure is unnecessarily suggestive, depends on the facts and circumstances of each case. *State* v. *Findlay,* 198 Conn. 328, 337–38, 502 A.2d 921, cert. denied, 476 U.S. 1159, 106 S. Ct. 2279, 90 L. Ed. 2d 721 (1986)." *State* v. *Arroyo,* 13 Conn. App. 687, 690, 539 A.2d 581, cert. denied, 208 Conn. 805, 545 A.2d 1103 (1988). To prevail on his claim the defendant "must show that the trial court erred in determining both the 'suggestiveness' and 'reliability' of the identification. *State* v. *Sims,* [12 Conn. App. 239, 242, 530 A.2d 1069 (1987)]." *State* v. *Barnes,* 16 Conn. App. 333, 343–44, 547 A.2d 584 (1988).

Turning to the first prong of the analysis, the defendant argues that the identification procedures employed were constitutionally infirm for the following reasons: (1) the victim had reason to anticipate that she would be seeing someone the police suspected was the perpetrator; (2) the defendant arrived in an unmarked police car of a similar make and model to the one driven by the victim's assailant; and (3) it was unnecessary for the police to undertake a public viewing.

It is not clear from the record whether the victim knew a suspect was expected at the restaurant. Assuming that she was aware that the police were bringing a suspect to the restaurant, we are unpersuaded that this information tainted the identification. Although it is true that when a witness "is asked to identify a person under circumstances in which it is evident that the police believe the person to be a suspect, there is a significant risk that the ensuing identification will have

resulted from the suggestiveness of the procedure rather than from the viewer's independent recollection"; *State* v. *Perez,* 198 Conn. 68, 73, 502 A.2d 368 (1985); the fact of such knowledge alone does not render the identification procedure tainted per se. See *State* v. *Hinton,* 196 Conn. 289, 292–93, 492 A.2d 837 (1985) (one-on-one show up not denial of due process per se); *State* v. *DeJesus,* 7 Conn. App. 309, 315, 508 A.2d 463 (1986) (no due process violation when identification made while defendant was seated in police cruiser); see also *State* v. *Arroyo,* supra. The essential inquiry is not whether the victim knew she would be seeing a police suspect, but rather whether the viewing was impermissibly suggestive and unreliable. *State* v. *Hinton,* supra; *State* v. *Theriault,* 182 Conn. 366, 371–72, 438 A.2d 432 (1980); *State* v. *DeJesus,* supra. The identification in this case was not a one-on-one confrontation between the complainant and the defendant. Cf. *State* v. *Hinton,* supra; *State* v. *DeJesus,* supra. On the contrary, the identification occurred at a public location and included the viewing of many white males. There is no evidence that the police singled out any particular person as a suspect, nor that any such indication was accomplished by subtle implication. We conclude that any awareness the victim may have had that she would see a person suspected to be her attacker that day did not render the identification impermissibly suggestive.

The defendant next argues that the use for the viewing of an unmarked police car of the same make and model as the one driven by the victim's assailant at the time of the crime was an "unsubtle tip-off" to the victim that the defendant was the suspect and, thus, rendered the identification impermissibly suggestive. The record discloses that the automobiles were not the same make and model. Sullo's was described as a dark grey, four door Dodge while the defendant's car, iden-

tified by the victim while passing his home, was a 1983 two door, dark blue Plymouth Reliant. The record does not disclose any similarities between these two cars and contains no photographs. Despite this absence of evidence in the record to support the defendant's claim, he argues that the court should employ its common knowledge to presume that everyone, including the victim, would identify an unmarked police car on sight. This we will not do. In attacking the identification procedures used by the police, the defendant bears the initial burden of establishing the suggestiveness and unreliability of the identification procedure; *State* v. *Hinton,* supra, 293; and, therefore, to present a record adequate for our review. On the record before us, we conclude that there was nothing inherently suggestive about Sullo's arriving with the defendant in an unmarked police car. There is no evidence that the victim knew that the car from which the defendant exited at the restaurant was an unmarked police car or that she noted any similarity between that car, which was grey, and either the blue car parked in some unknown person's driveway or the blue car used by the perpetrator. The fact that the defendant arrived at the restaurant in an unmarked police car did not render the identification constitutionally infirm.

The defendant's final challenge to the suggestiveness of the identification is that it was entirely unnecessary for the police to conduct a public viewing because a lineup or photographic array could have been arranged. We emphasize that there is no constitutional right to a line-up; *State* v. *Vaughn,* 199 Conn. 557, 562, 508 A.2d 430, cert. denied, 479 U.S. 989, 107 S. Ct. 583, 93 L. Ed. 2d. 585 (1986); and there is nothing inherently suggestive about a public viewing. See *State* v. *Ruiz,* 202 Conn. 316, 320, 521 A.2d 1025 (1987); *State* v. *Amarillo,* 198 Conn. 285, 291–92, 503 A.2d 146 (1986); *State* v. *Arroyo,* supra; *State* v. *Hyslop,* 10 Conn.

App. 457, 523 A.2d 1350 (1987). "[T]he state is under no affirmative duty to conduct every conceivable identification procedure." *State* v. *Vass,* 191 Conn. 604, 619, 469 A.2d 767 (1983). "Absent constitutional barriers, so long as the witness has identified the defendant with reasonable probability, whether the identification is the result of a photo display, a line-up, a show-up or otherwise, the evidence is admissible. The question, in the final analysis, is one of relevancy." *State* v. *Ledbetter,* 185 Conn. 607, 612, 441 A.2d 595 (1981). "If the state has not employed unduly suggestive methods of identification, its only remaining duty is to prove beyond a reasonable doubt at trial, that the identification is correct." *State* v. *Vass,* supra, 611. The defendant's argument, that other identification procedures were available, goes to the weight to be given that evidence rather than its admissibility. Id., 612.

Even if we were to assume, arguendo, that the procedures employed were suggestive, the defendant has failed to demonstrate that the identification was unreliable. " '[I]n assessing the admissibility of in-court identification testimony, reliability is the "linchpin." *Manson* v. *Brathwaite,* [432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977)]; *State* v. *Piskorski,* 177 Conn. 677, 742, 419 A.2d 886 [cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194] (1979). Reliability is to be determined by the totality of the circumstances . . . . ' " (Citation omitted.) *State* v. *Perez,* supra, 75. In determining the reliability of the identification, a number of factors are relevant including " 'the opportunity of the witness to view the [defendant] at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the [defendant], the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.' " *State* v.

*Miller,* 202 Conn. 463, 475, 522 A.2d 249 (1987), quoting *Neil* v. *Biggers,* 409 U.S. 188, 199, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).

Applying these factors to the facts of this case, we conclude that the initial identification was reliable. The victim testified that she had had a good view of the defendant at the time of the assault in daylight hours for approximately ten to fifteen seconds. Immediately after the assault, she had been able to describe the defendant to the police. The identification at the restaurant took place only eight days after the assault and the victim evinced a high degree of certainty that the defendant was the person who had assaulted her. We conclude that under the totality of the circumstances of this case, the defendant did not meet his burden of proving that the victim's first identification of the defendant was unreliable.

Having determined that the victim's initial identification of the defendant was not impermissibly suggestive or unreliable, it cannot be said that the second identification, made approximately one hour later, was tainted. *State* v. *Amarillo,* supra, 294; *State* v. *Perez,* supra, 74; *State* v. *Barnes,* supra, 345. Similarly, absent a tainted pretrial identification, it is unnecessary to review the suggestibility of the in-court identification. See *State* v. *Smith,* 200 Conn. 465, 469, 512 A.2d 189 (1986); *State* v. *Amarillo,* supra.

We conclude that the trial court did not err in denying the defendant's motion to suppress the pretrial identifications as the procedure employed was not impermissibly suggestive nor was the identification unreliable.

### III

The defendant's third claim is that the trial court erred in denying his motion to suppress evidence seized

from his home and automobile. The defendant asserts three arguments challenging the validity of the search: (1) the warrant was illegally issued; (2) the executing officers exceeded the scope of the warrant; and (3) the warrant was executed by officers outside their jurisdiction.

The defendant's first challenge is that the search warrant was illegally defective on its face because the affidavit failed to establish probable cause as to certain items and was not sufficiently particularized. The warrant specifically authorized a search for and the seizure of certain items including: "A 1983 Plymouth reliant two door sedan . . . red emergency vehicle lights; badges; uniforms; uniform ornaments; dark blue trousers; shirts and ties; uniform patches." The defendant concedes that the affidavit establishes sufficient probable cause with respect to all items listed except the uniform ornaments and the uniform patches. He argues that with respect to these two items, the warrant did not establish probable cause because the affidavit did not aver that the defendant wore these items at the time of the crime.

It is well established that "[i]n reviewing a search warrant affidavit the court 'must ascertain whether the facts in the affidavit are sufficient to justify an independent determination by a neutral and detached issuing judge that the necessary probable cause exists for the issuance of the warrant. *State* v. *Williams,* 169 Conn. 322, 326, 363 A.2d 72 (1975); *State* v. *Rose,* 168 Conn. 623, 627–28, 362 A.2d 813 (1975); *State* v. *Allen,* 155 Conn. 385, 391, 232 A.2d 315 (1967).' *State* v. *DeChamplain,* 179 Conn. 522, 527–28, 427 A.2d 1338 (1980); see *State* v. *Arpin,* 188 Conn. 183, 193, 448 A.2d 1334 (1982). 'Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or con-

viction . . . *and* (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched.' (Emphasis in original; citations omitted.) *State* v. *DeChamplain,* supra, 528–29; see *State* v. *Arpin,* supra." *State* v. *Delmonaco,* 194 Conn. 331, 337, 481 A.2d 40, cert. denied, 469 U.S. 1036, 105 S. Ct. 511, 83 L. Ed. 2d 401 (1984).

"Whether there is probable cause is to be determined upon facts stated in the affidavit purporting to establish grounds for issuing the warrant. *United States* v. *Harris,* 403 U.S. 573, 579, 91 S. Ct. 2075, 29 L. Ed. 2d 723 (1971); *State* v. *DeChamplain,* [supra, 530]. In considering the sufficiency of the affidavit we confine ourselves to the facts which appear on the face of the affidavit or which properly may be inferred therefrom; *State* v. *Williams,* 170 Conn. 618, 629, 368 A.2d 140, cert. denied, 429 U.S. 865, 97 S. Ct. 174, 50 L. Ed. 2d 145 (1976); testing those facts with common sense and reality; *United States* v. *Ventresca,* 380 U.S. 102, 108, 85 S. Ct. 741, 13 L. Ed. 2d 684 (1965); and with great deference to the fact that the issuing magistrate did determine that probable cause existed. *Jones* v. *United States,* 362 U.S. 257, 270–71, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960)." *State* v. *Couture,* 194 Conn. 530, 536, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985).

"When a warrant is sought to search specific premises for certain objects the information appearing in the affidavit should demonstrate a nexus between the objects to be seized and the premises to be searched. *United States* v. *Charest,* 602 F.2d 1015, 1017 (1st Cir. 1979). That nexus '[does] not have to rest on direct observation, but can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences . . . .' Id." *State* v. *Couture,* supra, 536–37. Probable cause must be examined in terms of whether the evidence

sought will aid in a particular apprehension or conviction. *State* v. *Gold*, 180 Conn. 619, 650–51, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980).

Although the affidavit did not state that the victim indicated that the assailant had ornaments or patches on his clothing, it did include the following information: (1) the victim was stopped by what she thought was an unmarked police car with a flashing light on the roof; (2) the victim's assailant was wearing a uniform, a badge and buckle, and identified himself as "Officer Taylor"; (3) the perpetrator fit the defendant's general description; (4) the description of the defendant's car matched that of the assailant; and (5) the defendant had purchased numerous, sundry uniform patches and ornaments bearing the inscription "C.E.S.A." (Connecticut Emergency Service Association).

The defendant was charged with the crime of criminal impersonation because he feigned being a police officer for the purpose of stopping the victim and effectuating the assault. Employing common sense in reviewing the facts contained in the affidavit, we conclude that there is more than sufficient information contained therein to allow a reasonable inference that the patches and ornaments were connected with the crime alleged.

The defendant claims that the warrant was invalid because it lacked particularization to authorize a search and seizure of any "badges" because the affidavit failed to contain a pictorial or written description of the specific silver badge described by the victim. The defendant maintains that this deficiency causes the warrant to be defective on its face and constitutes a "general" warrant. We disagree.

The fourth amendment to the United States constitution provides that a warrant must "particularly

[describe] . . . the persons or things to be seized."
A particular description of the item to be seized is
necessary to avoid a general exploratory rummaging
in the search. *Coolidge* v. *New Hampshire,* 403 U.S.
443, 467, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971). In
determining whether a warrant is sufficiently partic-
ular in describing an item to be seized, a number of fac-
tors are relevant, namely, the purpose for which the
warrant was issued, the relevance of the item to the
crime charged, and the total circumstances surround-
ing the case. *Marron* v. *United States,* 275 U.S. 192,
196, 48 S. Ct. 74, 72 L. Ed. 2d 231 (1927). The war-
rant must be sufficiently definite so that the officer
executing it can identify the property sought with rea-
sonable certainty. Id. The affidavit in this case con-
tained facts sufficient to allow for the search and
seizure of "badges" in that probable cause existed to
believe that badges purchased by the defendant in Dan-
bury were used in the crime of criminal impersonation.

The defendant next maintains that the executing offi-
cers exceeded the scope of the warrant by seizing a
number of items not named in the warrant. He argues
that handcuffs and a police baton are examples of items
seized that went beyond the warrant and were clearly
prejudicial. Other items seized were police hats, an
EMT jacket, and badge cases. All of these items were
admitted into evidence at trial. The state contends that
the seizure of these items was lawful under the plain
view doctrine. See *State* v. *Hobson,* 8 Conn. App. 13,
18, 511 A.2d 348, cert. denied, 201 Conn. 808, 515 A.2d
379 (1986), cert. denied, 480 U.S. 917, 107 S. Ct. 1370,
94 L. Ed. 2d 684 (1987), citing *State* v. *Pepe,* 176 Conn.
75, 405 A.2d 51 (1978).

The plain view doctrine may be invoked to validate
the seizure of evidence not mentioned in a warrant
where three requirements are satisfied: (1) the initial
intrusion that enabled the police to view the items was

lawful; (2) the discovery of the evidence was inadvertent; and (3) the police had probable cause to believe that the items were reasonably related, in an evidentiary sense, to the commission of the crime. *State* v. *DiStefano,* 7 Conn. App. 726, 730, 510 A.2d 995 (1986).

The defendant does not challenge the legality of the police intrusion or the inadvertence of the discovery of the items. He alleges that the items were improperly seized because they were not named in the warrant and constituted neither contraband nor evidence of criminal activity. We find this claim to be without merit. The required inquiry is whether the incriminatory nature of the items was immediately apparent so as to establish that the officers had reason to believe that the items were related to the crime that formed the basis of the warrant. *State* v. *Graham,* 186 Conn. 437, 443–44, 441 A.2d 857 (1982); *State* v. *Onofrio,* 179 Conn. 23, 41, 425 A.2d 560 (1979).

There is no evidence that the police, in searching for and seizing items called for in the warrant, ignored the limits of the warrant and conducted a search so general or exploratory in nature as to violate the prohibition on unreasonable searches and seizures in both our state and federal constitutions. We conclude that the trial court could reasonably have found that the challenged items were reasonably related to the crime of criminal impersonation and supported the defendant's modus operandi in committing the sexual assault. The court, therefore, did not err in refusing to suppress these items.

The defendant's final challenge to the search is that the police officers exceeded the bounds of their jurisdiction. The defendant did not raise this claim at trial and seeks review pursuant to *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973), and alternatively, under the plain error doctrine. Practice Book § 4185.

" 'Only in most exceptional circumstances can and will this court consider a claim, constitutional or otherwise, that has not been raised and decided in the trial court.' *State* v. *Evans,* supra, 69. 'There appears . . . to exist only two situations that may constitute "exceptional circumstances" such that newly raised claims can and will be considered by this court. The first is . . . where a new constitutional right not readily foreseeable has arisen between the time of trial and appeal. . . . The second "exceptional circumstance" *may* arise where the record adequately supports a claim that a litigant has clearly been deprived of a fundamental constitutional right *and* a fair trial.' (Emphasis added.) Id., 70." *State* v. *Smith,* 209 Conn. 423, 425, 551 A.2d 742 (1988). The defendant's claim involves an alleged statutory limitation on jurisdiction of the local police and is non-constitutional in nature. Consequently, review under *Evans* is unwarranted.

The defendant contends, alternatively, that we review this unpreserved claim under the plain error doctrine pursuant to Practice Book § 4185. The defendant does not assert the manner in which such an alleged error rises to the level of plain error. Furthermore, the error claimed by the defendant is not so obvious or so egregious as to constitute plain error.

## IV

The defendant next claims that the trial court erred in permitting the state to introduce into evidence a police baton and handcuffs with matching key. The defendant argues that these items were irrelevant, highly prejudicial, and tended to show criminal propensity. We find these claims to be without merit.

Our Supreme Court has repeatedly held that it is reversible error for the trial court to allow into evidence articles seized from the defendant that tend to show criminal propensity unless those articles are connected

to the commission of the crime charged. *State* v. *Wilson,* 199 Conn. 417, 449, 513 A.2d 620 (1986). To be admissible the evidence should establish a fact in issue or corroborate other evidence in the case. *State* v. *Onofrio,* 179 Conn. 23, 31, 425 A.2d 560 (1979). "The rationale of these cases is that, '[a]bsent such a connection, the balance of scales clearly tips against the probative value of the evidence.' [Id.]" *State* v. *Wilson,* supra, 449–50. The trial court must determine, in the exercise of judicial discretion, whether the prejudice to the defendant is outweighed by the probative value of the evidence. *State* v. *Onofrio,* supra, 28–29. Absent an abuse of that discretion, we will not reverse the trial court's judgment.

The complainant testified that she pulled her car over to the side of the road because she thought the defendant was a police officer. In addition to the sexual assault charge, the defendant was charged with impersonating a police officer. In light of the charges and the facts of this case, the evidence of handcuffs and a police baton found in the defendant's home was admissible to prove the crime of criminal impersonation and corroborative of the plaintiff's testimony. Although this evidence may have been cumulative of other evidence introduced to establish the crime of criminal impersonation, it was not of the type likely to excite the passions, awaken the sympathy, or influence the judgment of the jury. *State* v. *Wilson,* supra, 450; *State* v. *Onofrio,* supra, 30.

V

The defendant next claims that the trial court erred in admitting Sullo's testimony regarding his opinion that the composite sketch of the victim's assailant resembled the defendant. On direct examination, Sullo testified that on March 4, 1987, he received a copy of the composite sketch and a cover letter describing the crime from the Brookfield police department. In

response to questions about his reaction to the composite sketch, Sullo stated that the drawing resembled the defendant. The defendant argues that the admission of Sullo's lay opinion testimony was irrelevant and alternatively that, if relevant, its probative value was outweighed by its prejudicial effect. We disagree and find that Sullo's testimony was both relevant and admissible.

Lay opinion may properly be admitted on the issue of the identity or similarity of persons. C. Tait & J. LaPlante, Connecticut Evidence (2d Ed.) § 7.15.3 (b). Such testimony must, however, be based entirely on the witness' own perception or within his actual knowledge. *State* v. *Schaffer,* 168 Conn. 309, 318–19, 362 A.2d 893 (1975). "Because of the wide range of matters on which lay witnesses are permitted to give their opinion, the admissibility of such evidence rests in the sound discretion of the trial court, and the exercise of that discretion, unless abused will not constitute reversible error." Id., 319. The record is clear that Sullo knew the defendant and had professional encounters with him in the past so as to satisfy the above standard.[7]

## VI

The defendant's final claim is that the trial court erred in refusing to poll the jury during the trial after an article concerning the trial appeared in the local newspaper. The following facts are pertinent to this claim. Edward McGee, the owner of New England Uniform, the shop where the defendant had purchased police uniform items, was asked whether the defendant had said anything to him when he made his purchases. Out of the presence of the jury, McGee responded that when asked how to spell his occupation,

[7] Even if we were to assume, arguendo, that the trial court erred in admitting this evidence, in view of the complainant's solid identification testimony of the defendant, such an error would be harmless.

the defendant had replied "psycho-the-rapist." The trial court sustained the defendant's objection, finding that this remark was highly prejudicial and its relevance limited because the conversation occurred in 1985 and the remark may have been intended as a joke. The following day, a recitation of the McGee's testimony was reported in a local newspaper article encaptioned: "Jury Doesn't Hear Rapist Remark." The defendant requested the trial court to voir dire each member of the jury to determine whether any of them had read or heard about the case since the close of evidence the previous day. The trial court denied the defendant's request on the grounds, inter alia, that the court instructed the jury throughout the trial and at the close of evidence the previous day to avoid media coverage of the case and not to discuss the case with anyone, that there was no evidence that any juror had heard any prejudicial evidence, and that such an inquiry would invade "the sanctity of the jury process."

The defendant does not claim that any particular juror read the article or heard the radio reports, but rather that the court's refusal to poll the jury deprived him of his state and federal constitutional rights to an impartial jury. U.S. Const., amend. VI, XIV; Conn. Const., art. I, § 8.

"To raise the duty of inquiry by the trial judge to a constitutional level it is not enough for the defendant to show that the information contained in the newspaper article is inadmissible or even that it is arguably prejudicial. A constitutional duty to conduct an inquiry will arise if the character of the information contained in the newspaper article is such that it would so taint the proceeding that no curative instruction could effectively avert the prejudicial effect." *State* v. *Haskins,* 188 Conn. 432, 449, 450 A.2d 828 (1982).

We conclude that the article did not meet the requisite standard and, therefore, did not trigger a constitutional duty to conduct the requested inquiry. "If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day." *Holt* v. *United States*, 218 U.S. 245, 251, 31 S. Ct. 2, 54 L. Ed. 2d 1021 (1910).

The trial court properly and adequately instructed the jurors when they were impaneled not to read, listen to or watch any media coverage concerning the trial. This instruction was repeated numerous times during the proceedings. The record does not disclose that any juror ignored these instructions. We presume that jurors follow the instructions given by the trial court. *State* v. *Nelson*, 17 Conn. App. 556, 568, 555 A.2d 426 (1989). We conclude that the trial court did not abuse its discretion in denying the defendant's request.

There is no error.

In this opinion the other judges concurred.